Elm Development Company v. Commissioner.
Elm Development Co. v. Commissioner
Docket No. 83311.
United States Tax Court
T.C. Memo 1962-42; 1962 Tax Ct. Memo LEXIS 268; 21 T.C.M. (CCH) 239; T.C.M. (RIA) 62042; February 28, 1962
Charles E. Mahan, Esq., P. O. Box 599, Fayetteville, W. Va., and William H. Deck, Esq., for the petitioner. Vernon R. Balmes, Esq., for the respondent. *269 FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in petitioner's income taxes: Fiscal Year
Ended May 31
Deficiency
1956
$19,609.21
1957
15,827.51
1958
36,360.45
$71,797.17
The issues presented for our decision are (1) as to fiscal years 1957 and 1958, whether petitioner is entitled to percentage depletion on amounts received for mining certain coal under its contract with the lessee of the land which was mined; (2) the determination of the proper useful lives and salvage values on augers and other equipment used in petitioner's mining operations; (3) whether petitioner sustained a deductible bad debt in fiscal 1958 by reason of worthlessness of an account outstanding against one of its customers; (4) entirely dependent on issue (2), the amount of capital gains realized by petitioner on the sale of certain capital assets. Findings of Fact General Petitioner is a corporation organized under the laws of the State of West Virginia. It was organized April 19, 1955, and began coal mining operations on June 1 of that year. It filed its Federal income tax returns on *270 a fiscal year basis beginning June 1 and ending May 31. Its returns for the years ending May 31, 1956, 1957, and 1958 were filed with the district director of internal revenue, Parkersburg, West Virginia. Issue 1 Petitioner performed coal mining operations for various parties but we are concerned only with work performed for LoradoCoal Mining Company (hereinafter referred to as Lorado). Lorado was the lessee of certain West Virginia coal lands (including the Chilton seam) owned by Pardee Land Company of Philadelphia, Pennsylvania. After preliminary negotiations petitioner Lorado entered into an agreement under which petitioner was to auger [1] mine designated areas of the Chilton seam. The operations under the Lorado contract started on March 18, 1957. The formal agreement was signed April 17, 1957, and with slight variations to be hereinafter described was the contract under which all petitioner's mining operations for Lorado were performed during the fiscal years ending May 31, 1957 and 1958. The contract provided, so far as here pertinent (petitioner being referred to as "Contractor" and Lorado as "Company"): ARTICLE I (a) Subject to the subsequent provisions of this Agreement *271 and to the permit and consent of Pardee Land Company hereinafter referred to, Contractor will remove and the Company will permit it to remove, the earth from the outcrop of the Chilton Seam of coal making the same fit for auger mining and the Contractor will auger mine and the Company will permit it to auger mine the coal available for auger mining along said outcrop in the areas and as shown upon the plan or map marked "Exhibit A" attached hereto and made a part hereof. * * *
(c) Auger mining operations shall be conducted only in those areas shown on Exhibit A unless additional areas are agreed upon by Contractor and Company in writing. There is shown on Exhibit A the general location of the portals or entries which the Company may make should it determine to deep mine said Chilton seam of coal. Contractor shall not auger mine in such location but shall leave solid blocks of coal therein, not exceeding two hundred fifty (250) feet in width, so as to afford entries and access to the above mentioned mining operations of the Company shall plainly mark on the ground the actual location of such *272 contemplated portals or entries and the actual location and width of such solid blocks of coal as designated on Exhibit A, which are to be left by the Contractor prior to the beginning of operations of the Contractor in the area in which the same are located. If additional areas are agreed to, in writing, between the Contractor and the Company, as set forth in the last preceding paragraph of this Paragraph (c), they likewise and in like manner shall be marked on Exhibit A, or other map in lieu thereof, in advance of operations in such additional area or areas. Auger mining operations in Area No. 3 as shown on Exhibit A shall not be conducted in such manner as to materially interfere with the use by the Company of its tunnel and tramway located therein which the Company is presently using for the transportation of coal from its deep mining operations. * * *
(d) Contractor agrees to auger mine only that portion of said Chilton Seam of coal that the analyses of channel samples thereof which the Company shall make from time to time as hereinafter provided, shall meet the following requirements: [Requirements given] * * * In the event that such channel samples should not meet *273 the foregoing requirements, the Company shall have the right to direct the Contractor to auger mine other portions of said Chilton Seam in the same area in which auger mining operations are then being carried on, or in one of the other areas shown on Exhibit A, or in any amendment or addition thereto. If Contractor shall have benched substantial areas of coal, the channel samples of which have met the foregoing requirements, and it thereafter develops that the Company cannot sell the coal from such areas at a profit, after paying Contractor the price per ton agreed to be paid hereunder, by reason of the fact that the coal beyond the face of such seam and where channel samples cannot be taken, does not meet the foregoing requirements then and in such an event the Company will endeavor to find a market for such coal at a reduced price that will enable the Company to make a reasonable profit and will also enable the Contractor to realize a price per ton for such coal acceptable to it. If such coal can be sold by the Company at a price that will enable it to realize a reasonable profit and will also enable the Contractor to realize a price per ton acceptable to it, then the Company will *274 permit Contractor to auger mine such areas during the term of this agreement or within three (3) months thereafter, at such a time or times and under conditions that will not unreasonably interfere with the Company's other coal mining operations. The Company will pay Contractor for the production and delivery of such coal such an amount per ton as will be acceptable to Contractor and will also enable the Company to realize a reasonable profit from the same thereof. The Company will, at its own expense, take and make analyses of the abovementioned channel samples of the areas in which Contractor is auger mining at least once a week and will promptly advise Contractor of the results thereof, to the end that the Contractor may have as much advance knowledge of the results of such analyses as it is reasonably possible to give it prior to the uncovering of substantial areas of coal where channel samples do not meet the abovementioned requirements. The order in which the areas shall be mined and the direction in which the mining in any area shall progress, except as otherwise provided in this paragraph (d), shall be agreed upon from time to time by Contractor and the Company. (e) The *275 coal to be auger mined and delivered by the Contractor hereunder shall be processed, blended and mixed with other coal wholly produced by the Company in the Company's No. 5 preparation plant. * * *
(f) In the event of adverse market conditions and during any period when the Company shall not be able to sell all of the coal resulting from the blending and mixing of the coal produced and delivered by Contractor with coal produced by the Company, Contractor at Company's request will make such reduction in its production and delivery of coal as the Company in its discretion may deem necessary in order that the total amount of such blended and mixed coal thus available for sale will not exceed the amount which Company shall determine can be sold in the market at the time, consistent with the general sales practices and policies of the Company. The Company at all times shall exercise full and absolute discretion as to whom and for what price it shall sell such coal. (g) Contractor shall occupy the position of independent contractor of the Company and in no sense shall there exist any partnership relationship between Contractor and Company, nor shall there be any joint venture between *276 them. The Company shall not be liable for any obligations of the Contractor. Title to all coal mined and delivered by the Contractor shall at all times, from the time of its severance until its sale by the Company, remain in the Company and Contractor shall have no interest in the coal or in any proceeds from the sale thereof. All obligations of the Company to make payments to Contractor hereunder shall be obligations owed by the Company to be paid out of its funds or assets and Contractor shall have no lien or charge against any of the coal produced by it or against the proceeds from the sale thereof. (h) All obligations of the Contractor to auger mine and deliver coal hereunder and to perform the work connected therewith and all obligations of the Company to process, furnish facilities and to accept coal from the Contractor shall be contingent upon the ability of the respective parties to perform such obligations as such ability may be affected by war, strikes, work stoppages, failure of railroad car supply, floods, landslides, acts of God, failure of profitable markets, breakdowns, failure of equipment or other like or similar causes beyond the control of the respective parties. *277 (i) If by reason of war, strikes, work stoppages, failure of railroad car supply, floods, landslides, fires, acts of God, Failure of profitable markets, breakdowns, failure of equipment or other like or similar causes beyond the control of the respective parties, or either of them, the coal cannot be profitably auger mined and delivered by Contractor, or cannot be profitably processed and sold by the Company, and if such condition shall continue for as long as thirty (30) days, then either Company or Contractor shall have the right on fifteen (15) days' written notice to the other, to terminate this Agreement. * * *
(k) Although it is contemplated by the parties hereto that there is in excess of 250,000 tons of coal that can be auger mined under the terms hereof, nevertheless Contractor has inspected the premises and the work to be done and accepts this contract with full knowledge of all conditions relative thereto and without warranty by the Company as to any conditions or as to the number of tons of coal that can be auger mined, delivered and sold under the terms hereof. (1) This Agreement, unless sooner terminated as herein provided, shall continue in force and effect *278 for such period of time as may be required for Contractor to auger mine and deliver, as provided herein, the coal available for such mining in the areas above referred to. ARTICLE II Contractor agrees as follows: (a) To provide and maintain at Contractor's expense a sufficient amount of proper equipment and facilities to auger mine and deliver coal as required hereunder and to prepare and maintain at its own expense such grades, roadways, supply roads, and other roads upon the lands leased by Company under its said lease as may be necessary to enable it to properly perform this Agreement; provided, however, that the location of such grades, roadways, supply roads and other roads shall at all times be subject to the Company's approval before the same are constructed. Such grades, roadways, supply roads and other roads may be used by the Company in connection with its other mining operations and for the removal of timber, provided that the use of the same by the Company shall not materially interfere with the auger mining operations of Contractor. (b) To provide a sufficient number of qualified men to operate its equipment and produce coal by auger mining and deliver the same *279 in accordance with the terms hereof, and to establish satisfactory arrangements with United Mine Workers of America so that Contractor's production and delivery of coal shall be performed in accordance with all agreements now or hereafter entered into by the Company with United Mine Workers of America, or any of its districts or divisions. Contractor will not solicit for employment by it any of the employees of the Company. (c) To auger mine the seam of coal as provided herein and do and perform all work incidental thereto in a good and workmanlike manner and in accordance with approved and modern methods of auger mining. * * * (1) To pay all taxes assessed against its equipment and other property and to pay all other taxes and charges that are imposed upon it or assessed against it; provided, however, that Contractor shall not be required to pay any of the direct property taxes assessed against the coal in place or against the lands from which coal may be produced by Contractor under the terms hereof. It is understood that the State of West Virginia may impose upon Contractor a business and occupational tax and surtax on account of the work contracted to be done hereunder, *280 notwithstanding the fact that a production tax and surtax may also be imposed upon the Company for the same coal. Contractor will pay such taxes so imposed or assessed against it as and when the same are due and payable. * * *
ARTICLE III The Company agrees as follows: (a) To provide ground areas for buildings, road location and equipment storage space upon the lands leased by the Company under its said lease, which Contractor may require for the auger mining operations and the delivery and loading of coal hereunder. Such areas shall be adequate and convenient but shall be located by agreement between Contractor and Company so as not to materially interfere with the mining operations of the Company. * * *
(c) To pay Contractor for all merchantable coal (raw coal-less rejects) as hereinabove determined and which is produced and delivered by Contractor hereunder, the sum of Three and 65/100 Dollars ($3.65) per ton; provided, however, that if any general wage increase becomes effective after the wage increase of April 1, 1957, as a result of negotiations or contracts with United Mine Workers of America, or its applicable districts or divisions, by reason of which Contractor *281 is required to increase the wages of its employees engaged in performing the work hereunder, then the Company will pay Contractor an additional price per ton for the merchantable coal produced and delivered hereunder, which additional price shall be the increase in the cost per ton to Contractor to produce and deliver such coal brought about solely by the actual increase in the wages of the employees of Contractor engaged in the work hereunder, including any increase in the wages paid to truck drivers engaged in performing the work hereunder by any independent contractor of the Contractor. * * *
(d) To pay as and when the same are due and payable any and all business and occupational taxes and surtaxes imposed or assessed against the Company by the State of West Virginia by reason of the coal produced and delivered by Contractor hereunder notwithstanding taxes and surtaxes may also be imposed upon Contractor on account of the work contracted to be done hereunder. Pardee Land Company consented to this agreement and petitioner commenced mining the area originally designated under this contract. The area was subsequently completed and petitioner moved to other areas in the upper *282 parts of the Chilton seam which it has continued to mine. Petitioner also erected or maintained on the premises of the Chilton seam an office trailer, a prefabricated steel building (for a supply house), another building and three small sheds. All these structures were movable to other locations. Petitioner also resurfaced and placed cinders on the various access roads totaling about 4 miles to make them usable in all types of weather. These resurfacing and other costs relating to the roads were treated as current deductions on petitioner's appropriate tax returns. Petitioner and Lorado never resorted to the provisions of Article I, clause (d). The "reject" coal that was produced was not accepted by Lorado, nor could it be sold by petitioner inasmuch as the freight rates were prohibitive in relation to the price which petitioner could obtain for such low-grade coal. The United Mine Workers obtained a general wage increase in April 1957, but petitioner's price was not correspondingly increased. Petitioner received the $3.65 per ton price from Lorado for all coal delivered during the years in issue with two exceptions. In August and September 1957, petitioner agreed to accept, *283 temporarily, $3.47 per ton. The price was restored to $3.65 per ton in October 1957 and remained there until May 1958 when petitioner accepted a decrease to $3.15 per ton. [2] These price decreases were accepted by petitioner because of depressed market conditions and petitioner's consequent fear that Lorado might otherwise cancel petitioner's contract pursuant to its terms. Petitioner never received a price increase. Petitioner had no economic interest in the coal in place in the Chilton seam. Issue 2. Depreciation In its mining operations, petitioner extracted coal by what is known as the auger mining method. To utilize this process it is first necessary to blast or lift away the foreign substances or "outcrop" (usually slate, shale or sandstone) covering the face of the coal (the "high wall") in order to reach it and to provide enough space for a "bench" on which to station the auger and other necessary equipment. The auger operates by drilling holes horizontally into the "high wall," and removing the coal therefrom. By means of a conveyor in the auger the coal is then channeled into a truck located *284 on the "bench." Petitioner had two Compton augers and four bulldozers at the Lorado job site. The topography of the land on which the auger was placed was quite rugged and steep. The augers were therefore subject to constant abuse. The mining equipment at the Lorado job was operated generally on two 10-hour per day shifts for 5 or, sometimes, 6 days per week. Sometimes petitioner operated on three 8-hour shifts per day. Owing to the constant use of the equipment on rugged terrain, frequent repairs were necessary. These repairs were either charged to current expense or, if substantial, added to the basis of the equipment involved. The mining equipment was generally movable from place to place and very often could be sold after petitioner had finished using it. There have been continued improvements in the machinery employed in the coal industry with a trend toward complete automation. In computing the depreciation deductions on its Federal income tax returns, petitioner used the straight-line method on used equipment and the declining balance method on new equipment. It made no allowance for salvage value on any of its augers or bulldozers. For the capital assets, the *285 depreciation on which is still in dispute, [3] the following are the useful lives as determined by the parties and salvage values as determined by respondent together with other pertinent information: Useful Life (Years)
Salvage
Date
Peti-
Respond-
Value (Re-
Make or Model
Condition
Acquired
tioner
ent
spondent Only)
Augers
Compton
New
5/23/55
5
8
Compton
Used
3/15/57
4
6
$5,620.24
McCarthy *
Used
3/18/57
4
6
3,700.00
Bulldozers
D-8
New
3/ 2/56
5
6
D-9
New
8/ 1/56
5
6
TD-24
Used
8/ 1/56
4
6
1,488.65
Unidentified
Used
2/19/57
2
2
250.00
HD-21
Used
3/18/57
4
4
2,000.00
D-8
New
8/29/57
5
6
*286 The useful lives and salvage values of the assets (depreciation on which is in dispute) are as follows: Useful
Date
Life
Salvage
Equipment
Acquired
(Years)
Value
Augers
Compton (new)
5/23/55
6
0
Compton (used)
3/15/57
5
$5,620.24
McCarthy
3/18/57
5 1/2
3,700.00
Bulldozers
D-8
3/ 2/56
0
D-9
8/ 1/56
6
0
TD-24
8/ 1/56
6
1,488.65
Unidentified
2/ 9/57
2
250.00
HD-21
3/18/57
4
2,000.00
D-8
8/29/57
6
0
Issue 3. Bad Debt (Fiscal 1958) In the period March 18 to May 7, 1957, Elm had strip-mined coal for Kimberling-Colleries Company ("Kimberling") on a cost plus 10 percent basis. The aggregate billing to this account (including the profit) totaled $25,739.99 of which $13,698.32 was paid prior to May 31, 1958, (the end of the fiscal year concerned in this issue). The balance owed to petitioner as of this date was thus $12,041.67. Prior to May 31, 1958, petitioner made several telephone calls to Kimberling's offices and had several conferences with its president in an effort to collect the balance due. Petitioner was told in quite general terms that Kimberling's financial condition was very weak. The president of *287 Kimberling cautioned that should petitioner endeavor to have Kimberling adjudicated bankrupt its ultimate chances for collection would be jeopardized. Petitioner charged off the balance of the account as a bad debt as of May 31, 1958. Later in 1958, Kimberling obtained a loan from the Small Business Administration which together with other circumstances enable it to continue operating until June 30, 1959, at which time it made an assignment for the benefit of its creditors [4] and ceased doing business. Opinion Issue 1. Depletion Deduction. The parties agree that a taxpayer seeking a depletion deduction under section 611 (including the special percentage depletion deduction under section 613) [5] must show that he possesses an economic interest in the mineral in place. This is a fact question, to be decided under all relevant evidence in any given case. Palmer v. Bender, 287 U.S. 551 (1933); Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946); Parsons v. Smith, 359 U.S. 215 (1959). Respondent's regulations [6] supported by these and *288 other cases have long recognized this principle.
*289 We must thus decide whether petitioner here acquired an "economic interest" as distinguished from a mere "economic advantage" attributable to continued contractual relations with another party. See Helvering v. Bankline Oil Co., 303 U.S. 362 (1938). Chief among the indications that such an interest is absent in the possession by the other contracting party of the right to cancel the contract on short notice. Parsons v. Smith, supra; Usibelli v. Commissioner, 229 F. 2d 539 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court; United States v. Stallard, 273 F.2d 847 (C.A. 4, 1959). In the instant case, it might be argued that Lorado does not have the right of cancellation "without cause" under one plausible interpretation of the provisions of Article I, clause (i), quoted in our findings. We shall assume, arguendo, that clause (i) is to be read as furnishing an objective standard which governs Lorado's right to cancel and that Lorado does not have unfettered discretion to cancel whenever it subjectively believes the contract "unprofitable." Nevertheless, we feel that such a right of cancellation makes petitioner's "interest" *290 rather unstable and dictates against the conclusion that petitioner could mine "to exhaustion" within the meaning of the Parsons case. Walter Bernard McCall, 37 T.C. - (January 12, 1962); J. Shelton Bolling, 37 T.C. - (January 16, 1962). The record affirmatively demonstrates that the cancellation clause was intended to be enforced. Witness petitioner's acceptance of reduced prices when the retail market was depressed. Cf. Stilwell v. United States, 250 F. 2d 736 (C.A. 4, 1957). We further note that under Article III, clause (c), petitioner was to be paid for "all merchantable coal delivered" (italics supplied) and that there is no clause giving petitioner any right to sell coal elsewhere (except possibly the "reject" coal). This encourages the conclusion that petitioner looked for its payment to the personal covenant of Lorado and not to the severance and sale of the coal. Utah Alloy Ores, Inc., 33 T.C. 917 (1960); Parsons v. Smith, supra. In this respect the instant case is even stronger for respondent than was our recent case of J. Shelton Bolling, supra, at page 18 of the mimeographed opinion, where the miner had at least a theoretical *291 right to sell elsewhere. We are further reinforced in our construction of the contract by the language of Article I, clause (f), which gave Lorado complete control over the amount and timing of coal deliveries to it. This clause also gave Lorado absolute discretion as to the retail price of the coal and the identity of the vendees. Article I, clause (g), by its very words, also supports our interpretation. It is also noteworthy that even under Article I, clause (d) (pertaining to certain "reject coal"), Lorado was to handle the selling and simply remit a fixed price to petitioner. Again, the effect of market variations was to be borne by Lorado. Usibelli v. Commissioner, supra. In addition, petitioner received a fixed price per ton and under the contract it could not vary this price. True, petitioner twice received amounts below the contract price but the record makes it apparent that such reductions were temporary and were simply adjustments begrudgingly accepted by petitioner to avoid cancellation under the terms of the contract. It is noteworthy in this regard that petitioner never received amounts above the $3.65 contract price and there is no showing concerning the fluctuations *292 in the actual retail price received by Lorado during the period at issue. Nor does it seem likely that Lorado would ever increase the price to petitioner since petitioner was obligated in any event to mine the given areas if mining was "profitable" to it. As in any contract, it was always possible, of course, by novation that the parties could change the existing agreement to assure petitioner's direct participation in rises and falls in the retail market price, but such possibility is obviously not enough to support a conclusion that petitioner was currently looking to the sale of coal to recover its price. We thus conclude that petitioner was neither receiving the benefits nor incurring the detriments of the retail price variations. Such a conclusion strongly dictates against the existence of an "economic interest." Usibelli v. Commissioner, supra; Matagorda Shell Co., 29 T.C. 1060 (1958); Parsons v. Smith, supra. The most logical inference from the entire record is that petitioner hoped for, but was not assured, the continuation of the beneficial contractual relations until it had mined to exhaustion the entire Chilton seam. There was no *293 substantial investment in inflexible equipment or other related costs [7] not currently deductible and thus the emphasis of cases like Commissioner v. Gregory Run Coal Co., 212 F. 2d 52 (C.A. 4, 1954), and Commissioner v. Hamill Coal Corp., 239 F. 2d 347 (C.A. 4, 1956), upon large investment is not warranted here. There is perhaps slight importance to the fact that the initial draft of the agreement contained the language that petitioner "shall have no economic interest in the coal" and this language was eliminated in the final contract. However, the evidentiary significance of this change is much out-weighed by the other terms of the final contract. A similar observation is appropriate concerning the testimony adduced by petitioner to the effect that Lorado did not claim percentage depletion on its returns. It is manifest that tax consequences must be determined on the basis of what interests parties have actually transferred and *294 acquired, rather than according to tax treatment desired by the parties. [8] This proposition was aptly put by the Fifth Circuit in Pugh v. Commissioner, 49 F. 2d 76, 79 (1931): The proposal is to give this recorded instrument an effect according to the wish of the parties rather than that attributable to it by law, and thus to control as against the United States the application of the tax laws. * * * That by some other form of instrument the rights of the United States would have been different is beside the question. The parties abide by this instrument as they made it. The law, and not their wish or understanding, must control its legal effect on the incidence of taxation. The Board did not err in disregarding the parol evidence. *295 We accordingly hold that petitioner has not proven that it possessed an "economic interest" in the coal in place and is thus not entitled to a depletion deduction. Issue 2. Depreciation A. Useful Lives To ascertain the proper depreciation deduction under section 167, the basis of the depreciable asset (minus its salvage value) must be spread over the asset's useful life in the taxpayer's business. Hertz Corp. v. United States, 364 U.S. 122 (1960); sec. 1.167(a)-1(a), (b), Income Tax Regs. This obviously involves the determination of a question of fact. We have taken all the evidence into account and are convinced, principally because of the rough topography of the land on which the two Compton augers were operated, that respondent's determination of useful lives of 8 and 6 years for the new and used augers, respectively, is unrealistic. On the other hand, petitioner's estimates appear too low inasmuch as the augers were moved about from one site to another and were adaptable to more than one job. We have accordingly found that 6 and 5 years are more accurate estimates of useful life. We are aware that normal obsolescence arising from technological improvement *296 within an industry must be considered in determining useful life. We believe that some obsolescence of this type was present and we have reflected it in our determination. But we are unconvinced that it was so great or drastic as to make the augers completely outmoded prior to the termination of their normal useful lives. The record furnishes no evidence establishing the useful life of the McCarthy auger (which was not used on the Lorado job) but we believe that respondent's determination as to its useful life should be reduced to 5 1/2 years because of obsolescence. This is reflected in our findings of fact. We cannot accept the vague and general testimony of petitioner's general manager (which amounted to no more than bald statements of the ultimate fact in issue) concerning the useful lives of the bulldozers and we thus sustain respondent's determination as to these assets. B. Salvage Value The second point of contention under the depreciation issue is respondent's determinations of salvage values of the equipment involved. It is clear that salvage value (at termination of useful life) must be subtracted from basis to determine the amount to which the depreciation rate *297 is to be applied. Hertz Corp. v. United States, supra.See Brandtjen & Kluge, Inc., 34 T.C. 416 (1960); sec. 1.167(a)-1(c), Income Tax Regs. Here petitioner's president testified that much of the equipment was resalable and could be used by others after petitioner was finished using it. Petitioner's general manager testified to the same general effect. Several pieces of equipment were in fact sold at substantial prices, or leased. Petitioner has done nothing to show that respondent's rather conservative estimates of salvage value (as to any of the assets) are in error. We sustain respondent's determination of salvage values and have made our findings accordingly. Issue 3. Bad Debt It is settled that a taxpayer seeking a bad debt deduction under section 166(a) [9] must demonstrate that the debt owing to him has become worthless in whole or in part during the course of the taxable year. Spring City Co. v. Commissioner, 292 U.S. 182 (1934). The worthlessness of the obligation is the sole question before us on this issue. *298 The question presented is essentially one of fact. Here we begin with the consideration that petitioner's debtor, Kimberling, continued its operations for more than 1 year after the debt's alleged worthlessness. Admittedly petitioner's failure to institute bankruptcy proceedings or to commence other legal action for collection of the debt is not alone fatal to the deduction. [10] But when viewed against Kimberling's continued operations and the subsequent Small Business Administration loan to Kimberling, we believe that this inaction indicates that the parties still entertained hopes that the debt would be paid in full. Here, it appears that the inaction was due not to any believed hopelessness of the situation but rather to the opinion of all involved that petitioner's chances for recovery would be jeopardized if it insisted upon immediate satisfaction and refused to await further developments to learn whether Kimberling could revive its shaky financial picture. Cf. W. D. & Sedley Roussel, 37 T.C. - (November 21, 1961). In the words of petitioner's president: I know, too, that we were advised that should we instigate any sort of proceedings that would result in bankruptcy proceedings *299 which would lessen our opportunity for collecting the account. The failure of petitioner to demonstrate any collection efforts after May 31, 1958, is significant in this regard. We do not feel that it is at all unrealistic or necessarily in conflict with prudent business management to conclude that there were reasonably hopeful chances of collection of the debt as of May 31, 1958. Accordingly, we sustain respondent's disallowance of the bad debt deduction. Issue 4. Capital Gains The disposition of this issue is entirely controlled by our opinion on Issue 2 under which the proper useful lives and salvage values for depreciation purposes were ascertained. With such determinations the proper basis for *300 determining gain or loss can be computed. Decision will be entered under Rule 50. Footnotes
1. The process is more fully described under the findings of fact of Issue 2.↩
2. The prices received by petitioner after May 1958 are not in evidence.↩
3. The parties are in complete agreement as to the basis of all the assets involved and the methods of depreciation properly employed. The controversy centers around the useful lives and salvage values of the assets indicated. While the petition alleges error in these particulars as to all types of equipment, petitioner has made no effort to disprove respondent's determination as to any assets other than augers and bulldozers. We thus do not consider depreciation on these other items to be any longer in dispute.↩
*. Not used on Lorado contract. ↩
4. The extent of petitioner's participation in this assignment is not revealed by the record.↩
5. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule. - In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * * SEC. 613. PERCENTAGE DEPLETION. (a) General Rule. - In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section. (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: * * *
(4) 10 percent - * * * coal * * * ↩
6. § 1.611-1 [Income Tax Regs.] Allowance of Deduction for Depletion. * * *
(b) Economic interest. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital interest in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter * * * to compensation for extraction * * * does not convey a depletable economic interest. * * *↩
7. The only immovable investment was the one made in road resurfacing costs which we have found were deducted as current expenses. See J. Shelton Bolling, 37 T.C. - (January 16, 1962), at page 18 of the mimeographed opinion.↩
8. It is likewise of no meaning that Pardee Land Company consented to the contract between petitioner and Lorado. We cannot agree with petitioner that this circumstance establishes petitioner's acquisition of an "interest in land" from Lorado. At best, it is a mere legal conclusion by Pardee as to the meaning of the contract between Lorado and petitioner. It is altogether possible that Lorado sought Pardee's approval merely out of an abundance of caution.↩
9. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
10. § 1.166-2 [Income Tax Regs.] Evidence of Worthlessness. * * *
(b) Legal action not required. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166.↩