C. W. and Mattie STILWELL and S. W. and Rosie Stilwell, Appellants,

v.

UNITED STATES of America, Appellee.

No. 7499.

United States Court of Appeals Fourth Circuit.

Argued Nov. 12, 1957.

Decided Dec. 27, 1957.

John Y. Merrell, Washington, D. C. (Francis W. Flannagan and Homer A. Jones, Jr., Bristol, Va., on brief), for appellants.

Marvin W. Weinstein, Attorney, Department of Justice, Washington, D. C. (John N. Stull, Acting Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, Washington, D. C., John Strickler, U. S. Atty., and H. Clyde Pearson, Asst. U. S. Atty., Roanoke, Va., on brief), for appellee.

Richard L. Hirshberg, Washington, D. C., on brief for National Coal Ass'n, amicus curiæ.

Before SOBELOFF and HAYNSWORTH, Circuit Judges, and THOMSEN, District Judge.

THOMSEN, District Judge.

The only question presented by this appeal is whether taxpayers are entitled, under secs. 23(m) and 114(b) (4) (A) (ii) of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 23(m), 114(b) (4) (A) (ii), to deductions for percentage depletion from their gross income from certain coal mining operations conducted by them under an oral contract with Paragon Jewel Coal Company, Inc.

Paragon leased from the owners all of the coal land involved in this case and obligated itself to pay an annual minimum royalty, tonnage royalty, wheelage, land taxes and extraction taxes. It made substantial improvements necessary for transporting, processing and marketing the coal, including roads, railroad sidetrackage and a tipple with processing equipment. Paragon elected not to mine the coal underlying its leased boundaries, but entered into oral contracts with several mine operators to conduct the mining operations at their own risk and expense.

Taxpayers C. W. Stilwell and S. W. Stilwell, who, with their respective wives, filed joint income tax returns for the year 1952, have been engaged for many years in the mining of coal in Buchanan County, Virginia, as partners, under the trade name Bear Ridge Coal Company. They first discussed a contract with Paragon's superintendent in the summer of 1951. He showed them a boundary of coal and offered them a choice of three operations. After examining the property, taxpayers selected one of the operations and entered into an oral contract to produce coal. The superintendent advised taxpayers how far back and how far to the right and left they were entitled to mine.

The provisions of the contract were not explicitly stated, but must be determined from the course of conduct of the parties as well as from the fragmentary evidence of their conversations. Taxpayers were obliged to extract all mineable coal in the area allocated to them and to deliver the coal at their expense to Paragon's tipple. Taxpayers could not sell the coal to anyone else without the permission of Paragon. Paragon agreed to receive and to pay taxpayers a specified price per ton for all coal so mined and delivered. It was understood, however, that this price might be modified prospectively from time to time. The contract was for no

738

specific term. Taxpayers assumed the full responsibility and expense of opening and operating the mine in accordance with state and federal mining laws, including all engineering services required. Paragon was to build and maintain a road from its tipple to a point approximately two hundred feet from taxpayers' mine head; taxpayers were to build and maintain a road for the remaining two hundred feet. It was agreed that at the conclusion of the operation taxpayers might remove their mining equipment but might not remove any buildings or items necessary for the safety of the mine. At the time the contract was made depletion was not discussed.

Pursuant to the contract, taxpayers built the two hundred foot road, faced up the mine, constructed a tipple at the mine entry, a powder house, a repair and equipment shop and a weighing house with scales, installed a power plant and fans, laid track, and cut back under the roof in preparation for mining coal. Over a period of four years taxpayers trebled their investment in cutting machines, diesels, compressors, mine cars, steel rails, motors and trucks. Taxpayers have continued their mining operations from 1951 up to the present time, with an interruption of two weeks due to a proposed change in the price of coal and labor costs. The price per ton paid by Paragon to taxpayers has been raised and lowered from time to time, sometimes as the result of an increase in labor costs, sometimes as a result of an increase or decrease in the market price of coal. Two neighboring contractors have ceased operations, and Paragon has given taxpayers the right to mine their areas. The question of the right to terminate has never arisen between taxpayers and Paragon.

The district judge noted that under the applicable authorities a number of criteria must be considered in determining whether a taxpayer has such an economic interest in the mineral as to be entitled to a percentage depletion deduction. He found that, although some of the criteria favored the conclusion that taxpayers did acquire such an economic interest, the more important criteria required the conclusion that taxpayers acquired only an economic advantage. He, therefore, held that taxpayers were not entitled to a depletion deduction. D.C., 152 F.Supp. 111.

The basic principles underlying the allowance of a deduction for depletion were first stated in Lynch v. Alworth-Stephens Co., 267 U.S. 364, 365, 45 S.Ct. 274, 69 L.Ed. 660, and were restated by Mr. Justice Brandeis in United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054: "The depletion charge permitted as a deduction from the gross income in determining the taxable income of mines for any year represents the reduction in the mineral contents of the reserves from which the product is taken. The reserves are recognized as wasting assets. The depletion effected by operation is likened to the using up of raw material in making the product of a manufacturing establishment." 274 U.S. at page 302, 47 S.Ct. at page 610.

■ At first the depletion deduction was a certain percentage of cost. It was discovered, however, that cost was frequently so low that it did not adequately reflect the value of the assets, and the law was amended to permit the deduction to be based on the value of the property at the time the mineral was discovered. It was then found that it was very difficult to determine the extent of the mineral deposits and the consequent value of the asset, and since 1926 Congress has permitted an alternative depletion deduction, namely, a fixed percentage of the annual receipts from sale of the minerals. Despite these changes in the method of calculating the depreciation deduction, the basic purpose of its allowance has not changed. United States v. Dakota-Montana Oil Co., 288 U.S. 459, 467, 53 S.Ct. 435, 77 L.Ed. 893; Helvering v. Bankline Oil Co., 303 U.S. 362, 363, 366–367, 58 S.Ct. 616, 82 L.Ed. 897; Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308,

312, 76 S.Ct. 395, 100 L.Ed. 347. The depletion deduction is not to be construed as a reward to those who actually mine the coal for the risks inherent in its extraction. Usibelli v. Commissioner, 9 Cir., 229 F.2d 539; Untermyer v. Commissioner, 2 Cir., 59 F.2d 1004.

A number of cases have considered the problem of the person or persons to whom the deduction should be allowed. See particularly Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, in which the doctrine of "economic interest" in the mineral in place was developed. The present state of the law was summarized by Judge Soper in Commissioner v. Hamill Coal Corp., 4 Cir., 239 F.2d 347, 349, as follows:

"It is agreed that the right to a depletion allowance is dependent upon the ownership of an economic interest in the mineral deposit and that when more than one person has such an interest the allowance must be equitably apportioned between them. It is also agreed that title to or ownership of the deposit is not essential to the creation of an economic interest therein. It is enough if the taxpayer has acquired by investment any interest in the mineral in place and secures by any form of legal relationship income derived from the severance and sale of the mineral to which he must look for the return of his investment. However, a taxpayer who has no capital investment in the deposit does not possess an economic interest merely because by contract with the owner he possesses an economic advantage derived from production. See § 29–23(m-1) of Treasury Regulations 111."

See also Weirton Ice and Coal Supply Co. v. Commissioner, 4 Cir., 231 F.2d 531, and Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 212 F.2d 52.

Various factors enter into the question whether a taxpayer has acquired by investment such an interest in the mineral in place as amounts to an economic interest. Usibelli v. Commissioner, 9 Cir., 229 F.2d 539. A most important factor is the terminability of the taxpayer's rights. Although the agreement in the instant case was for no specific term, the conduct of the parties under the agreement indicates that they intended it to continue, with modifications from time to time, so long as taxpayers' operations were properly conducted and the coal could be profitably mined and sold. Taxpayers spent appreciable sums to face up the mine and to build a powder house, a tipple and a short connecting road; they nearly tripled their investment in equipment. These expenditures do not of themselves amount to an investment in the coal in place, but they do indicate that the parties did not intend the contract to be terminable at any time at the will of Paragon. The contract was not terminable by Paragon so long as taxpayers' operations were satisfactory and the coal could be profitably marketed. Moreover, as we have seen, the price per ton paid by Paragon was changed from time to time as a result of an increase or decrease in the market price of coal, as well as because of a change in labor costs. This is not a case where the contract is clearly terminable at the will of either party and where the contractor's income is dependent upon the personal covenant of those with whom he has contracted without regard to the price at which the coal is sold.

We conclude that taxpayers did acquire an economic interest in the coal, and are entitled to a share of the depletion allowance. The judgment of the district court is reversed and the case remanded for the entry of a proper judgment in favor of plaintiffs.

Reversed and remanded.