**ELM DEVELOPMENT COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE,** Respondent.

No. 8769.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 16, 1963.

Decided March 19, 1963.

Richard L. Braunstein and William H. Deck, Washington, D. C. (Chas. E. Mahan, and Mahan, Higgins, Thrift & Graney, Fayetteville, W. Va., on brief), for petitioner.

Thomas A. Skornia, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Robert N. Anderson, Attorneys, Department of Justice, on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

The issue in this appeal from the United States Tax Court is whether Elm Development Company, as to fiscal years 1957 and 1958, is entitled to a percentage depletion deduction based on amounts received for mining coal under a contract with the lessee of the mined land. The Tax Court decided against Elm's claim.

Laredo Coal Mining Company is lessee of the land involved under a lease entered into on June 2, 1947, with the Pardee Land Company. On April 17, 1957, Laredo and Elm entered into a written agreement, whereby Elm would auger mine coal in certain areas of Laredo's leasehold.

In the process of auger mining, it is first necessary to remove the material or "outcropping" covering the coal. A "bench" is then provided for stationing the auger and other equipment. A hole is drilled horizontally into the face of the coal (the "high wall") with an auger, a large screw-like drill. The coal is then delivered by means of a conveyor in the auger to a truck stationed on the "bench".

Under the contract, Elm was an independent contractor operating without supervision by Laredo. Elm built roads and benches to be used in the operation, the cost of the roads being deducted by Elm as a current operating expense. Elm utilized its own machinery and

equipment, all of this being movable and usable elsewhere. Elm agreed to purchase liability insurance, pay all taxes (except for those on coal in place or on lands on which coal was located), obtain all necessary licenses, and regrade and replant all areas mined.

Elm was to receive $3.65 per ton of coal delivered to Laredo, with provision for price adjustments for general wage increases negotiated by the United Mine Workers.

Laredo had the right to cancel only if the operation became unprofitable or if Elm defaulted. Elm was to deliver approximately 1000 tons of coal per 24 hour period, Laredo retaining the right to reduce this amount if adverse market conditions occurred. The coal was to be delivered only to Laredo, including all rejects, Elm retaining no right to sell coal elsewhere. Title to all coal mined, from the time of severance, was to remain in Laredo, with no interest passing to Elm, and Elm was to look solely to Laredo for any payments, having no lien or charge on the coal produced. Elm had the right to mine the land of coal that met certain requirements to exhaustion, subject to Laredo's right to terminate for default or unprofitability.

On these facts, Elm contends that it is entitled to take a depletion allowance based on its gross income from the mine as provided by the Internal Revenue Code of 1954, 26 U.S.C.A. § 611. The issue concededly centers upon whether Elm has such an "economic interest" in the coal in place that would allow it to claim the depletion allowance.

As indicated by the quotation marks, the term "economic interest" is a word of art, having obtained a special meaning in the tax laws concerning depletion. As is so often the situation, "economic interest" is a term simple of statement but difficult of application. It has given rise to much litigation, the government at times having taken inconsistent positions based on the same transaction. See Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

One of the most frequently cited attempted clarifications of the phrase, announced in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933), provides that depletion is permissible where "the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital". This has been incorporated into the Treasury Regulations, Treas.Reg. 1.611–1–(b)–(1), which goes on to state "but a person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production".

Despite these definitions, or perhaps because of them, situations similar to the instant one have been worked out on a case by case analysis, based upon the courts' consideration of the scope of the mining company's relationship to the mineral.

A landmark decision in this area is that of Supreme Court in Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed. 2d 747 (1959). That case involved two taxpayers who entered into agreements with coal field owners to mine the field and deliver the coal to the owners at a stated price, variable with the union wage agreements. The taxpayers both provided their own equipment, which was all movable and usable elsewhere. Both agreements were terminable at will, in one case on ten days notice and in the other on thirty days notice.

The Court stated that each taxpayer had a mere terminable at will agreement to mine coal for the owners at a specified price, and that a terminable contractual right to mine coal, even with the miner's own equipment, did not rise to the level of an "economic interest" in the coal in place.

The Supreme Court indicated that (1) the petitioner's investment was in movable equipment, (2) the equipment was depreciable, (3) the contracts were ter-

minable at will without cause and on short notice, (4) the landowners did not agree to give the taxpayers a capital interest in the coal in place, (5) the coal belonged to the landowners and had to be delivered to them, (6) the taxpayers were paid a fixed price per ton that did not vary with market prices, and (7) the taxpayers looked only to the landowners for sums due.

The Court held, based on the above, that the taxpayers received an economic advantage, but did not acquire an "economic interest", in the coal in place.

Prior to the Parsons case, the Fourth Circuit permitted the mining company to claim depletion in Commissioner v. Gregory Run Coal Co., 212 F.2d 52 (4 Cir., 1954); cert. denied 348 U.S. 828, 75 S.Ct. 47, 99 L.Ed. 653 (1954); Weirton Ice & Coal Co. v. Commissioner, 231 F.2d 531 (4 Cir., 1956); Commissioner v. Hamill Coal Corp., 239 F.2d 347 (4 Cir., 1956); and Stilwell v. United States, 250 F.2d 736 (4 Cir., 1957).

In Weirton the land originally was owned by the mining company but, under the agreement, was transferred at cost to the other party to the mining agreement. There was also an understanding that after cessation of operations the title to the land was to be returned to the mining company. We leave open the decision as to whether the result in Weirton was overruled by the Supreme Court in Parsons. Cf. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933); Hamme v. Commissioner, 209 F.2d 29 (4 Cir., 1953); cert. denied 347 U.S. 954, 74 S.Ct. 679, 98 L.Ed. 1099 (1954), and cases therein cited. In Stilwell v. United States, supra, the agreement as found by the court, was terminable only if the mining company performed unsatisfactorily or the operation became unprofitable. It was also found that the price received by the mining company varied with the market price of coal. Underscoring the importance of non-terminability, the court allowed the claimed depletion.

Decisions since Parsons v. Smith have generally denied the depletion allowance to the mining company. United States v. Stallard, 273 F.2d 847 (4 Cir., 1959), and McCall v. C. I. R., 312 F.2d 669 (4 Cir., 1963), are similar to the instant case except that in both of those cases there was an unlimited right to cancel on short notice. In Stallard the mining company built permanent roads, and in McCall there was a sizeable investment in deep mining equipment. Nevertheless, the terminability clause was deemed so important that the depletion allowance was denied. Judge Soper, speaking for this Circuit in Stallard on the question of terminability, said:

"A number of circumstances under the varying facts of the decided cases have been considered important factors in concluding on which side of the line the transaction falls. Perhaps the most important is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract at will. If the operator has the absolute and exclusive right under the contract to exhaust the deposit, it is usually held that he has an economic interest in the mineral which entitles him to a depletion allowance, but if the owner has the right under the contract to terminate the relationship at will, the operator is deemed to be an employee of the owner or an independent contractor compensated at a specified rate with no right to the deduction."

One of the agreements in Gregory Run, the agreement in Weirton, and the agreement in Hamill were terminable at will on short notice. In Hamill the agreement was on a year to year basis. Taking these factors into account, we treat Hamill and that part of the Gregory Run opinion involving the terminable agreement as having been overruled by the Parsons case.

We distinguish the instant case from Parsons, Stallard and McCall on

the ground of terminability. Where a contract to mine coal or extract mineral is terminable at will or on short notice, the mining company is in the position of an employee or an independent contractor merely mining coal for the owner and paid on a piecework basis. However, where the agreement is not so terminable, the mining company has been granted a right in the coal in place; that is, the right to mine till exhaustion. This right has been paid for by the mining company through its acquiescence in the final draft of the contract, containing mutually agreeable terms arrived at through the give and take of negotiation. It may be that the price relation was varied to take the mining company's right into account, or perhaps the consideration is to be found in the mining company's agreement to construct, at its expense, permanent improvements on the property. Whatever the course of negotiation, suffice it to say that this is a bargained for right and the consideration, be what it may, is the mining company's investment in the coal in place. Its right to mine the coal without risk of cancellation is its economic interest in the coal in place. The owner has given up an interest in the coal, his right to mine it himself or to determine whether it is mined and who is to mine it. Where the contract is terminable at will or on short notice the owner has given up none of his rights in the coal in place. He can cease operations, mine himself, or appoint another to mine. He retains complete control over the coal in place and over the price to be paid.

Elm's contract with Laredo was terminable on two grounds, default by Elm or lack of profitability to Laredo. That terminability due to Elm's default does not require a finding of no economic interest is obvious. Many leaseholds and fee interests are so terminable. Neither, we hold, does terminability because of unprofitability. This is not such a vague standard as to make the right to cancel arbitrary. We distinguish the instant case from Denise Coal Co. v. C. I. R., 271 F.2d 930 (3 Cir., 1959) on the ground

that in Denise the mining company did not have the exclusive right to mine to exhaustion, and the agreements were on a year to year basis.

We, therefore, hold that Elm Development Company is entitled to claim the depletion allowance.

In the view we have taken of the case it is unnecessary to discuss Elm's contention that the parties' negotiations indicate that Laredo specifically intended to grant an "economic interest" in the coal in place.

There were in this case before the Tax Court certain other deficiencies which are not considered on this appeal. We, therefore, remand the case to the Tax Court for recomputation of the taxpayer's deficiencies in accordance with this opinion.

Remanded.