CBN CORPORATION (Formerly Columbian Carbon Company)

v.

The UNITED STATES.

No. 243-59.

United States Court of Claims.

Feb. 14, 1964.

Davis, J., dissented.

Robert J. Casey, New York City, for plaintiff. Frederick H. Stokes, New York City, Harry J. Gerrity, Washington, D. C., and Clark, Carr & Ellis, New York City, were on the brief.

Mitchell Samuelson, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner and Earl L. Huntington, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

The plaintiff, the CBN Corporation (formerly Columbian Carbon Company), sues for an alleged overpayment of Federal income taxes which it claims were improperly collected by the defendant for the tax year 1953.

The ultimate issue is whether plaintiff had a sufficient economic interest in certain natural gas in place in Moore County, Texas, during the tax year 1953, under a contract hereafter described, to entitle it to participate in the depletion allowance for income tax purposes.

The issue is governed by sections 23 (m) and 114(b) (3) of the Internal Revenue Code of 1939 (26 U.S.C., 1952 ed.).[1] These sections provide, in the case of oil and gas wells, a depletion allowance of 27½ percent of the gross income from the property during the taxable year.

Treasury Regulations 118 [2] issued pursuant to the Code stipulates that the owner of an economic interest in mineral deposits shall be allowed an annual depletion deduction, and states that:

"An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived

from the severance and sale of the mineral or timber, to which he must look for a return of his capital."

The plaintiff reported an income tax liability for the year 1953 in the sum of $3,921,707.66 and paid this amount in installments during the year 1954. On March 28, 1957, the District Director, Internal Revenue Service notified plaintiff that an additional assessment for the year 1953 had been recommended in the sum of $115,574.37, plus interest. That additional amount was assessed by the Commissioner of Internal Revenue and paid by the plaintiff.

The plaintiff filed a timely claim for a refund in the amount of $46,320.60 or such larger amount as might be legally

---

1. Pertinent parts of the two sections are as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(m) Depletion.

"In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

"For percentage depletion allowable under this subsection, see section 114(b) (3) and (4).

\* \* \* \* \*

"§ 114. Basis for depreciation and depletion.

\* \* \* \* \*

"Basis for depletion.

\* \* \* \* \*

"(3) Percentage depletion for oil and gas wells.

"In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph."

2. Pertinent parts of Treasury Regulations 118 are as follows:

"§ 39.23(m)–1. Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.—

"(a) Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

"(b) Under such provisions, the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. \* \* \* An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. \* \* \*

\* \* \* \* \*

"(i) 'The property,' as used in section 114(b) (2), (3) and (4) and §§ 39.23 (m)–1 to 39.23(m)–19, inclusive, means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate 'property'; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single 'property,' provided such treatment is consistently followed."

refundable, on the ground that the Commissioner had erroneously disallowed a deduction for percentage depletion on royalty payments to the plaintiff by the Shamrock Oil and Gas Corporation (hereafter referred to as "Shamrock").

Notice of disallowance of the claim was issued in May 1959.

The claim for depletion allowance was based on a contract made in 1952, which became effective January 1, 1953, but for a clear understanding of that contract it is helpful to trace the dealings between the plaintiff and Shamrock which began in 1935.

Natural gas is ordinarily composed of hydrocarbons—hydrogen and carbon. There are a number of different combinations of carbon and hydrogen—named or classified on the basis of the relative proportions of the two main ingredients in the mixture.

When the natural gas reaches the surface some of the hydrocarbons are in liquid form and others are liquefiable.

Shamrock operated a plant called the McKee Plant in Moore County where the liquid or liquefiable hydrocarbons were extracted or separated from the lighter hydrocarbons. After such removal, about 95 percent of the original or raw gas remained. This remaining 95 percent is sometimes called residue gas. This remainder was not altered in individual physical or chemical characteristics by the process of extraction.

It will be noted that the statute provides that in the case of oil and gas wells the allowance for depletion "shall be 27½ per centum of the gross income from the property during the taxable year," excluding certain items of expense incurred by taxpayer. The allowance may be and frequently is divided among many different owners of economic interests in the property in question. The total allowance cannot exceed 27½ percent of the gross income. But that amount is allowed if claimed by those entitled to such deduction.

Usually the lessee pays those having economic interests on the basis of an aggregate of one-eighth of the market price of the oil or gas. The lease usually provides that the lessee may purchase the product but must account for the market price whether sold at the mouth of the well or purchased by the lessee or sold in the open market.

The sequence of events out of which the instant issue arises began in 1935. Shamrock was then engaged, *inter alia,* in the production of natural gas from lands owned or leased by that company in Moore County, Texas. The Western Carbon Company (hereafter referred to as "Western") at that time was engaged in the manufacture of carbon black by a process which burned vast quantities of natural gas.

An agreement was made between the two companies by the terms of which Western agreed to construct a plant for the manufacture of carbon black with a capacity for utilizing a minimum of 30,000,000 cubic feet of gas per day. The agreement also provided that Shamrock (referred to in the agreement as "Seller") should sell to Western (referred to in the agreement as "Buyer"), and the latter would purchase from Shamrock a daily minimum of 30,000,000 cubic feet of residue gas, i. e., natural gas from which the liquid and liquefiable hydrocarbons had been removed by Shamrock.

Pertinent terms of the agreement are set out in finding 12(b). The Buyer was given the right to cease burning the gas at any time, in which event the Buyer could resell to other purchasers. In the latter event different terms of paying Shamrock for the gas were provided. The apparent reason for the provision was the fact that in the production of carbon black the burning of more than 1,000 cubic feet of gas was required to produce a small quantity of carbon black. There was a continuing threat of legislation to prevent such tremendous use of a natural resource to produce so small an amount of carbon black, even though the latter was a valuable product.

A similar agreement was entered into on the same date, October 1, 1935, between Shamrock and the Reliance Carbon

Company, Inc., the respective parties being referred to as "Seller" and "Buyer."

A subsidiary agreement, also dated the same day, gave both Western and Reliance preferential rights in the purchase of gas made by Shamrock in 12,000 acres in Moore County. As a safeguard, the Buyer was given the "right at any time to cease burning all or any part of the gas it has been burning, and resell for other purposes said gas," at a different specified method of payment. (Findings 12 and 15.)

On January 2, 1936, Western assigned to plaintiff all rights in the agreements described above.

An amendatory agreement was entered into in 1937 between Shamrock and plaintiff, which was then operating the carbon black plant. The agreement increased the contracted plaintiff's minimum purchase of natural gas by 15,000,000 cubic feet per day.

The amendatory agreement further provided that "Buyer [plaintiff] shall have the first right hereunder in priority to all other uses or disposition of its natural gas made by Seller [Shamrock] in three thousand (3,000) acres of gas territory owned or controlled by Seller and located in Moore County, Texas, the gas from which is legally available for the manufacture of carbon black."

The agreement further provided that the plaintiff would add additional units to its carbon black plant, which it later did. The prior right to purchase and to receive gas was increased in 1946 by 3,250 acres. This later agreement also provided that Seller would desulphurize all gas to be resold. It also provided for a somewhat different method of paying Shamrock for the gas. Other minor amendments were entered into in 1947, 1949, and 1951. The material change in these agreements was the following:

" * * * [T]he aggregate volumes of residue gas which Buyer [plaintiff] has the prior right to purchase and which Seller [Shamrock] has the obligation to sell and deliver to Buyer * * * is the fractional part of the residue gas remaining (after being processed for the recovery of liquid hydrocarbons in either Seller's McKee plant or its recently acquired Sunray plant, located near Sunray, Moore County, Texas) from all of the sour gas reserves of Seller heretofore accepted by Buyer * * * represented by a fraction, the nominator [sic] of which is 12,250, and the denominator of which is 62,225 * * *. Said fractional part of said residue gas is hereinafter referred to as the "dedicated reserves" of Buyer. It is agreed, however, if there shall be available from such dedicated reserves of Buyer in excess of forty million (40,000,000) cubic feet daily, averaged monthly, Buyer shall not be obligated to purchase in excess of forty million (40,000,000) cubic feet daily, but shall be privileged to purchase, by notifying Seller in writing of its desire to so purchase, the volumes attributable to the reserves of Buyer up to forty-two million (42,000,000) cubic feet daily when such volumes are available from such sources * * *." [Finding 21.]

All of these agreements and the amendments thereto were purchase contracts. The Buyer agreed to purchase and pay in one form or another for a minimum of 30 or more million cubic feet of gas per day, and the Seller agreed to give the plaintiff the prior right to purchase the available gas produced from certain designated reserves available after removal of the liquids and liquefiable hydrocarbons.[3] Under the amendatory provisions, the obligations were limited to fractional parts of the designated reserves.

---

3. The 1935 contract contained the following provision:
   " * * * nothing herein contained shall prevent Seller from selling, trading or abandoning any lease or gas contract in the ordinary course of business, or of exchanging any part of its gas resources for other gas resources of substantially equal amount."

Under all these contracts Shamrock had claimed and had been granted the full 27½ percent depletion deduction for all of the gas used in the contracts and the amendatory agreements. Plaintiff did not claim at any time any depletion allowance under these purchase agreements.

After September 11, 1951, Shamrock represented to the plaintiff that it desired to be free of the dedication to the plaintiff of its gas reserves in Moore County in order that Shamrock might be free to negotiate more favorable contracts with the Northern Natural Gas Company. In October it negotiated a contract with the latter company to be effective January 1, 1953, for the sale of gas, including gas from the acreage to which the plaintiff had been given the prior right of purchase. However, as will be noted in finding 21, that dedication had been by one of the amendments limited to a fractional part approximately one-fifth of the gas from the dedicated area.

## THE NEW CONTRACT

On November 19, 1952, Shamrock and the plaintiff entered into a contract that superseded the prior agreements between the parties. Pertinent parts of the new agreement are set out in finding 24.

This was an entirely different contract. It terminated the previous agreements. Under the new contract the plaintiff was no longer obligated to buy and Shamrock was no longer obligated to sell any gas to the plaintiff. Thereafter Shamrock was to sell or dispose of the gas.

As compensation, Shamrock agreed to pay plaintiff 6 cents per 1,000 cubic feet (Mcf) in connection with the sales of residue gas that were within the scope of the contract. The contract covered a fraction, the numerator of which was 9,000 and the denominator 62,625, of the reserves described in Schedule A attached to the contract. The contract covered the residue gas after the removal of all liquids or liquefiable hydrocarbons, and after certain other requirements named in the contract had been defined. Subject to these exceptions plaintiff was to be paid 6 cents per Mcf on the designated percentage of all gas produced, used, or sold from the designated properties. Plaintiff's right to be compensated was further safeguarded by the following stipulation:

"4. * * * provided that if Shamrock should cease to process through its plant or plants the gas produced from its sour gas reserves, or any part thereof, and shall make sale thereof at the well or wells where produced, then such payments shall be applicable to the proportionate part of the raw gas volumes that may be sold by Shamrock." [Finding 24.]

Paragraph 9 of the contract stipulated that plaintiff would not be required to pay any portion of gross production or severance taxes levied prior to March 1, 1950. Plaintiff, however, agreed that it should be billed by Shamrock for its proportionate part of any increases after March 1, 1950, of gross production taxes, severance taxes or other excise taxes, and other taxes that might be thereafter levied. Plaintiff thereafter paid its proportionate share of increased production taxes, severance taxes, and other excise taxes levied upon or with respect to volumes of gas as specified in paragraph 9.

After the cancellation of the old agreements and entering into of the new contract, Shamrock did not claim any depletion allowance for the portion of the gross income from the residue of gas, use or sales that had been paid to the plaintiff. Plaintiff, after the 1952 contract, which became effective January 1, 1953, claimed a depletion allowance in reporting and paying its income for the year 1953. The deduction was disallowed, additional assessments were levied and collected, and plaintiff seeks a refund.

The question is: Did the plaintiff have an economic interest in the gas in place under the new contract which became effective January 1, 1953?

The plaintiff asserts that under the statute and regulations heretofore quoted and under the decisions of the various courts, it had an economic interest in the gas in place under the new contract. The

defendant claims that plaintiff did not have such an interest.

We think plaintiff had such an economic interest. All of the previous agreements—the ones entered into in 1935 and all amendments thereto—were pure purchase agreements with varying terms but nevertheless the plaintiff was a buyer and Shamrock a seller of the residue gas up to a certain minimum from a designated acreage in Moore County, Texas.

Under the new contract the plaintiff was no longer a purchaser nor was it a user of natural gas. It was simply permitted to sit back and draw what was equivalent to royalty payments on its designated percentage of all gas produced, used or sold from the acreage designated in the new contract.

Under the old contracts, plaintiff purchased and used and had the privilege of reselling all of the residue gas covered by the contracts. The plaintiff was nothing more than a purchaser with certain priority rights of purchase. Under the 1952 contract it was no longer a purchaser with the right to either use or resell the gas. In this respect the plaintiff was in the position of any holder of royalty interest in the proceeds of oil or gas production. Practically all lease contracts have a provision that the royalty holder or holders shall be paid usually one-eighth of the proceeds of the sale at the then market price of a pro rata part of any oil or gas that is produced and marketed.

Some of the royalty provisions stipulate that the owner or holder of the royalty is entitled to one-eighth of the oil or gas produced. However, the standard form provides that the lessee shall have the right to purchase the oil or gas in the pipeline or sell it in the open market, accounting to the royalty owner for his proportionate part of the sales or market price of the product. If the lessee sells or transfers the commodity to someone else for production and marketing he must account for the royalty for his proportion of the market price of the product at the time.

Likewise, if Shamrock removed and sold or used any of the gas covered by the contract it must account to the plaintiff for the payments. If it used the gas, it was required to account to plaintiff for the market price at the time. If Shamrock ceased to process the gas produced from the reserves and should make a sale at the well or wells where produced, the plaintiff was required to be paid for the proportionate part of the raw gas volumes sold by Shamrock. In fact on the occasion of explosion and fire that destroyed Shamrock's plant in Moore County, this is exactly the course that was taken and plaintiff was paid on the specified basis until such time as the plant could be restored.

Thus, Shamrock could not remove for use or resale a single cubic foot of gas without paying plaintiff its designated percentage of the proceeds. It could not even sell the product at the well without accounting to the plaintiff for its payments.[4] The plaintiff could require Shamrock to keep the oil in place or make its payments. There was no other alternative. There was no way for either party to receive any funds unless Shamrock removed and used or sold

---

4. The 1952 contract ran with the land. In fact both contracts ran with the land. Any contract runs with the land if it affects the land, is in writing duly acknowledged and filed with the deed records. This is true in practically all the states. The provision is fashioned after the old English statute of frauds which was enacted to prevent oral contracts affecting and complicating land titles.

No doubt the reason for including the specific provision in the original contract was the fact that in that agreement Shamrock had the right to substitute other lands for those designated, provided they had equivalent productive quality. It was simply to make certain that such substitution would not affect plaintiff's purchase contract. No substitution was provided in the new contract. Plaintiff's interest was tied to the specific lands. Due to the cancellation, there was of course no obligation on the part of plaintiff to purchase any gas after January 1, 1953.

the commodity itself. Even if Shamrock had sold or transferred all its holdings and lease contracts in Moore County to another producer while the product was still in the ground, the plaintiff's rights would follow and still be effective and plaintiff would be entitled to its payment either by the buyer, the transferee, or by whoever might remove the gas. In other words, it had an economic interest in the gas in place which remained through any of these changes.

■ It is not necessary that the holder of an economic interest have title to the property. This is made clear in the case of Commissioner v. Southwest Exploration Co., 350 U.S. 308, 312, 314, 76 S.Ct. 395, 100 L.Ed. 347 (1956), where it states that:

"* * * a taxpayer is entitled to depletion where he has: (1) 'acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship 'income derived from the extraction of the oil, to which he must look for a return of his capital.' [Palmer v. Bender] 287 U.S. [551], at 557 [53 S.Ct. 225, at 226, 77 L.Ed. 489]." [350 U.S. p. 314, 76 S.Ct. p. 312, 100 L.Ed. 347]

■■ No particular form of the legal interest of a taxpayer is required in deciding whether the taxpayer has the necessary economic interest for purposes of the depletion allowance. See Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062 (1946), and cases therein cited, for a thorough discussion of the principles involved. As was stated in Southwest Exploration Co., supra, the depletion allowance in the Internal Revenue Code of 1939 is solely a matter of congressional grace and is limited to the 27½ percent of the gross income from the property after eliminating certain items paid by the taxpayer with respect to the property.

The fact is that a depletion allowance is not given to anyone until the product is taken from the ground. If an owner of a piece of land sells it outright he gets no depletion allowance because, in fact, there is no depletion. Until there is some separation and thus some exhaustion and until that separated portion is marketed or sold in some form that produces income, there is no tax and in the nature of things there can be no deduction for depletion. Production and marketing, under standard oil and gas lease contracts, are as intimately linked as the law of demand and supply.

We quote from the case of Palmer v. Bender (1933), 287 U.S. 551, at pages 557–58, 53 S.Ct. 225 at pages 226–227, 77 L.Ed. 489, the following:

"Similarly, the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so he has an economic interest in the oil, in place, which is depleted by production. Thus, we have recently held that the lessor is entitled to a depletion allowance on bonus and royalties, although by the local law ownership of the minerals, in place, passed from the lessor upon the execution of the lease."

The case of Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938), which both parties cite, makes the distinction between economic advantage and economic interest. It recognizes that the language of the statute is broad enough to cover any form of legal relationship, and cites Palmer v. Bender, supra. It distinguishes the two cases on the ground that the respondent's contract in the Bankline case was merely for installing and maintaining the necessary pipelines through which the producer agreed to deliver the natural gas produced at the well and that respondent should extract the gasoline therefrom and pay to the producer 33⅓ percent of the total gross proceeds derived from the sale of the gasoline or wet gas, and that the taxpayer was still a processor paying

for what it received at the well's mouth and therefore had no capital investment. In other words, that was simply another purchase contract and the taxpayer was found to have no interest as a processor of natural gas where it only contracted to buy gas after severance from the ground.[5]

The defendant undertakes to cite this authority for the claim that in the instant case the taxpayer had made no capital investment, but the record clearly shows the facts to be otherwise. The record shows that the price and demand for natural gas had increased. The plaintiff under the old agreements had the right to purchase this gas in making carbon black and resell the excess. It had priority rights in the purchase and the use of a specified minimum of 40,-000,000 cubic feet of gas per day. While apparently the demand for gas in vast quantities for the manufacture of carbon black was probably not as great—whether on account of new processes for manufacture of carbon black or the enactment or threat of enactment of future conservation measures and restrictions does not appear from the record—the general sale of natural gas was greatly increasing and the plaintiff had the privilege of reselling the gas in a market that was rapidly expanding.

Plaintiff traded all these advantages for a new contract that simply gave it an assured right to participate on a definite basis of a definite percentage of all the residue gas produced by Shamrock during the life of the field. This was certainly the cancellation and surrender of a valuable right and was full and adequate consideration for an economic interest in the gas in place. This is especially true since neither Shamrock nor any assignee could produce or extract a single cubic foot of natural gas nor secure one cent of revenue for itself without accounting to the plaintiff for the payment of its proportionate share of the gross income.

The 1952 contract was an arm's length transaction in which plaintiff released

---

5. We have examined all the cases cited by both parties, as well as some other decisions, and while there is some overlapping and indeed some confusion, this clear dividing line is recognized by all of them. This was true in Scofield v. La Gloria Oil and Gas Co., 5 Cir., 268 F.2d 699 (1959), and in Parsons, et al. v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), as well as in the other cases which defendant discusses.

The Palmer v. Bender case, supra, makes it clear that the right to depletion allowance does not depend on ownership, or any other particular form of legal interest in the contract.

In Commissioner v. Southwest Exploration Company, supra, which involved slant or whipstock drilling, the owner of the upland site had no title or ownership in the underwater oil. It simply contracted as an upland owner to furnish the site for the drilling equipment and machinery and was to receive a percentage of the net profits. The drilling leaseholder claimed the entire 27½ per centum of the depletion allowance, but the Supreme Court held that the upland owner who merely owned the site was entitled to its proportion of the depletion and the leaseholder to the balance. The Court does mention in Southwest that the site furnished was essential to the drilling contract, but this was only one of the elements mentioned by the Supreme Court. We have seen no case that holds that a party must be essential to a drilling contract in order to have an economic interest. There are many cases where the holder of an economic interest was not essential to a drilling contract, except in the sense that no minerals could be marketed without payment to the holder of the interest. It would be futile to drill if the product could not be sold. Neither in the Southwest case nor in the case at bar could the minerals be removed without compensating the contract holder of an interest in the proceeds of any minerals produced or removed.

The case of Elm Development Company v. Commissioner, 4 Cir., 315 F.2d 488 (1963), affecting coal, deals with the same principle involved here, and holds that an independent operator who contracts with the lessee to mine coal at a certain adjustable price per ton has an economic interest entitled to depletion deduction. It contains an excellent discussion of the subject and distinguishes that case from Parsons v. Smith, supra.

None of the other cases cited by either party materially changes this over-all picture.

its absolute right to purchase a portion of Shamrock's reserve and received in consideration the equivalent of an overriding royalty. This was certainly a substantial investment. Plaintiff's right to the payment for the gas sold by Shamrock was noncancellable and an indefeasible right to the payment so long as production existed.

Plaintiff's interest in the gas was as depletable under the new contract as was the interest of Shamrock. Both oil and gas are depletable products; sometimes very rapidly and sometimes before the cost of drilling is paid for. When the product is exhausted all interests of either party are gone. Both Shamrock and plaintiff had an economic interest under the new contract in the gas in place. The attorneys for both Shamrock and plaintiff evidently proceeded on the belief that under the purchase contracts and amendments thereto made in 1935 and subsequent years prior to the 1952 contract, Shamrock was entitled to the complete 27½ percent depletion deduction on the entire gross income, and the full 27½ percent was claimed by Shamrock and allowed by the Internal Revenue Service. In any event, the question of whether plaintiff could have asked for a part of the depletion allowance under the old contract is not involved here and is immaterial since it has no bearing on the question of whether plaintiff has an economic interest under the new contract.[6]

6. We further summarize our position as follows:

1. See footnote 4.

2. By the terms of the November 19, 1952 contract, the earlier contracts were terminated and were to have "no further force and effect [after January 1, 1953] except as to final accounting." Whatever may have been their terms they were cancelled as of January 1, 1953. For this reason, the terms of the 1935 contract have no bearing on the 1952 contracts. Any claim for depletion deduction that plaintiff might possibly have made under the old contract has long since been barred by limitations. However, since that contract has been under discussion, we would like to state why we conclude that plaintiff never had any depletion rights under the former contracts.

3. The 1935 contract was a purchase contract, that is, plaintiff had a priority right to purchase a minimum amount of gas at a specified price. The plaintiff is termed "Buyer" and Shamrock "Seller." The Buyer could burn or resell the excess gas. Should the area designated prove insufficient to supply plaintiff with enough gas to meet its needs, the Seller would not be responsible for the shortage but plaintiff might purchase the balance of its needs elsewhere.

4. The cases generally hold that a purchaser of gas after it is produced does not have a depletable interest. There are literally thousands of such purchasers who, if their purchase of marketable gas entitled them to depletion deduction, would be making claims, thus vastly complicating the present problems. Hence, the necessity for drawing a line.

5. Under the terms of the 1952 contract, plaintiff was no longer a Buyer, and Shamrock was no longer a Seller to plaintiff. Shamrock, which had been the Seller in the old contracts, now took over the complete production and marketing of the gas. The former Buyer had no part in the marketing. It only had the right to 6 cents per thousand cubic feet of any gas that might be produced and either used or marketed by any one. Shamrock agreed to take over from plaintiff the resale of any gas which plaintiff was obligated to purchase under the terms of the old contracts. This applied merely to any gas plaintiff was obligated to purchase under the old contracts up to the time of the effective date of the new contract, i. e., January 1, 1953.

6. By article 5 of the earlier contracts, the Seller was not only to produce but was required to build a 22-inch pipeline and deliver the gas to purchaser's plant. By section 14 of the original contract, that part of the purchase price of gas which Seller was to receive in carbon black is classed as royalty to Seller.

7. While the 1935 contract was binding on both parties, their successors and assigns, the limitations on the numerous rights of the respective parties would also bind the assigns. The Buyer was not required to purchase all the gas produced on the property in question. There was a minimum and a maximum amount of gas the Buyer was required to purchase.

8. By the terms of the new contract, the former Buyer was no longer in any sense a purchaser. Shamrock was both producer and Seller. Shamrock was simply required to pay a royalty of 6 cents

Under the new contract both Shamrock and plaintiff proceeded on the basis that each was entitled to its division of the 27½ percent. Therefore, after 1952 Shamrock claimed and was allowed only its proportionate part of the allowable deduction and plaintiff claimed only its percentage of the same deduction, the denial of which is the basis of this action.

There is no doubt that someone was entitled to the entire 27½ percent. When asked in oral argument how it came to pass that only a part of the statutory 27½ percent was allowed for 1953, the response of defendant's counsel was that Shamrock probably made a mistake in not claiming the balance. At any rate, someone is entitled to the exhaustion or depletion allowance of that portion of the gross income which is represented by plaintiff's part of the gross income. It seems manifest from the record that plaintiff had an economic interest in the gas in place and is entitled to a depletion deduction with respect to its income from that interest. We so find.

The amount of recovery will be determined pursuant to Rule 38(c) of the rules of this court.

DAVIS, Judge (dissenting):

The court holds, and plaintiff expressly admits in its briefs, that prior to the 1952 contract plaintiff had no depletable interest in the natural gas produced by and purchased from Shamrock. At the oral argument, after questioning from the bench, plaintiff ultimately withdrew from this concession, but its original

position was clearly right. Under the 1935 agreement (as supplemented), plaintiff's predecessor had no "economic interest" in the gas in place but only the "economic advantage" possessed by a purchaser of the gas who has obtained favorable terms from the seller. Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938), authoritatively ruled that a taxpayer which purchased gas from the producer, and then processed it (by removing the heavier hydrocarbons), was not entitled to depletion. For the period before 1953, this holding blankets plaintiff *a fortiori;* plaintiff was further removed than the purchaser in Bankline from the gas in place since it purchased the gas from Shamrock *after* the latter had extracted the gas and removed the heavier hydrocarbons. The fact that in this case the agreement was for the life of the seller's resources in Moore County does not distinguish Bankline; there, one type of contract called for the purchase of all natural gas produced at a given well (id., 303 U.S. at 365, 58 S.Ct. 616, 82 L.Ed. 897). See, also, Scofield v. La Gloria Oil & Gas Co., 268 F.2d 699 (C.A.5, 1959).

I can discern no transformation, via the 1952 contract, from a mere economic advantage to an economic interest in the gas in place. That new contract did not purport to grant plaintiff any property interest—e. g., leasehold or fee—either in the land from which Shamrock drew its gas or in the gas itself.[7] No other change in status, as between the parties,

---

per thousand cubic feet of gas which Shamrock should produce and market. Plaintiff was required to do nothing. However, neither Shamrock nor its successors could produce and dispose of a single cubic foot of gas without paying plaintiff a royalty. This certainly gave plaintiff an economic interest in the gas in place.

9. By article 10 of the 1952 contract, plaintiff's rights could not be transferred until Shamrock had been furnished with the original instrument of transfer. By article 11, it was stipulated that "This Agreement [1952 contract] shall continue so long as gas is produced from any gas well or wells" described in the contract.

By article 12, the contract was made binding on the parties, their successors and assigns. These provisions are usual in any royalty contract.

10. The cases uniformly hold that legal title is not required, but only an economic interest in the minerals in place, and that no particular form is necessary in preserving that interest.

7. The 1952 agreement contains no provision declaring it a covenant running with the land, but merely the ordinary clause stating that the contract shall be binding and inure to the parties and their successors and assigns. In contrast, the earlier agreement contained, in addition to the

is spelled out in the phrasing of the agreement. Rather, the paragraphs of the preamble (together with the circumstances surrounding the new pact) indicate that the parties simply desired to rearrange the terms of purchase and sale for their mutual advantage. Plaintiff wished to shut down its carbon black plant and to resell all of the gas purchased from Shamrock; the latter wished to sell the gas more profitably to another company; both parties "concluded that it would be more economical and convenient to arrange for the resale of the aforesaid volumes to be made by Shamrock in its own name and on its responsibility as between the seller and purchaser of such gas." [8] The resulting agreement merely transferred from plaintiff to Shamrock, its vendor, the right to sell for it the part of the residue gas which it was required under the old contract to purchase and which it could resell; plaintiff's compensation was to be a share of Shamrock's new (and higher) selling price. The transaction, though more complex, remained at bottom one of sale and purchase. Plaintiff

gained no property interest of any kind in the land or minerals.

Aside from Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956), no Supreme Court decision has allowed depletion to a taxpayer who did not have either a fee or leasehold interest in the oil-producing property itself. Taxpayer equates itself with the upland owners in Southwest Exploration whose land was essential to drilling operations and whose contribution of that essential upland "was an investment in the oil in place sufficient to establish their economic interest" (id. 350 U.S. at 316, 76 S.Ct. at 399, 100 L.Ed. 347). The investment here, it is argued, was the former contractual right to obtain residue gas from Shamrock; that contribution, it is also said, is essential to Shamrock's producing activities. The opinion in Southwest Exploration, however, cautions that the Supreme Court was not taking a drastic step away from the prior doctrine (id. 350 U.S. at 316–317, 76 S.Ct. at 399–400, 100 L.Ed. 347). In my view, the theory of that decision

normal clause relating to assignment, another clause specifically agreeing "that the provisions of this agreement * * * shall be deemed to be covenants running with the respective lands, leases," etc., and also covenanting that the "parties * * * will not dispose of any of same in bulk, or in such material part as to disable them from performing their obligations hereunder without causing the party to whom such property shall be transferred, together with its successors and assigns, to assume and be bound by the terms hereof."

8. The preamble to the 1952 contract discloses (in its fourth paragraph) that plaintiff desires to shut down its carbon black plant and "desires to effect a *resale* of the volumes of gas it is authorized to resell under the terms and provisions of the aforesaid contracts [i. e., the pre-1952 contracts]." (Emphasis added). In the fifth paragraph of the preamble, it is pointed out that any purchaser of such residue gas would have to receive it from Shamrock and would likewise have to deal with Shamrock on various matters (e. g., pressure, deliveries, etc.); the preamble then goes on to say that "the

parties hereto, having considered such matters, have concluded that it would be more economical and convenient to arrange for the *resale* of the aforesaid volumes to be made by Shamrock in its own name and on its responsibility as between the seller and the purchaser of such gas and that an accounting between the parties hereto with respect to such *resale* volumes be made on a basis mutually satisfactory in lieu of the accounting between the parties required under the terms of the aforesaid contracts in the event a *resale* of such volumes to another purchaser should be accomplished by Columbian." (Emphasis added.) The sixth paragraph of the preamble states that Shamrock "is willing to undertake to accomplish a *resale* of the volumes of residue gas which Columbian is authorized to *resell* under the provisions of the aforesaid contracts in lieu of making delivery thereof to Columbian, and is willing to make certain payments to Columbian with respect to the volumes of residue gas remaining from gas produced from its sour gas reserves to the extent of the volumes which Columbian would, except for this contract, be authorized to sell to others." (Emphasis added.)

cannot properly be applied to plaintiff's case.

The upland in Southwest Exploration was physically essential (under California law) "to the drilling for and extraction of oil" (350 U.S. at 317, 76 S.Ct. at 400, 100 L.Ed. 347); but no interest of plaintiff's, contractual or proprietary, was essential to the physical process of extraction and production of gas by Shamrock. That company could bring up and process the gas without trenching on any of taxpayer's rights and without its leave. Taxpayer's concern did not begin with the raw gas as it came from the well. Nor did that concern even commence with the manufacture of *residue* gas. Just as in the pre-1953 period, taxpayer's concern only began with the *sale* by Shamrock of the residue gas. Prior to that stage, plaintiff had no connection with the mineral. Under the express provisions of the 1952 agreement, Shamrock could use the gas, without accounting to plaintiff in any way, for specified ends of its own—including use for fuel for compression purposes, for processing and production purposes, and for manufacturing steam. Not until the moment of sale did any obligation to plaintiff arise or plaintiff have any concern with the gas.[9] This was not an interest in the gas *in place*.

The court, in holding otherwise, stresses the fact that there was no way for either party to receive any funds unless Shamrock removed and used or sold the commodity itself. But the test of a depletable interest is not the mere participation of the taxpayer in the realization of gain from the mineral. The regulations provide (Treas.Reg. 118, § 39.23 (m)–1(b)) that "an agreement between the owner of an economic interest [*i. e.,* Shamrock] and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest." The Bankline decision, supra, similarly held against a depletable interest where the contractor had the right to purchase all the gas from the well. See, also, Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959); Scofield v. La Gloria Oil & Gas Co., supra. In those situations it was just as true as here that neither party—landowner or contractor—could receive any funds unless the owner removed and sold the gas. The same was true under plaintiff's pre-1952 agreement. As in that instance, this factor is insufficient to give plaintiff an economic interest in the gas *in place*.[10]

I am concerned, too, that the rearrangement of plaintiff's contract with Shamrock should be considered the equivalent of a capital investment, in 1952, in the mineral. If such an investment is deemed to have been made here, it would appear relatively easy for a contractor with a mere "economic advantage" to obtain a depletable "economic interest" by a reshuffling of the contractual terms—and without the grant of a recognizable property interest in the land or mineral.

---

9. The contract provided:
"4. There shall be no restriction nor limitation on Shamrock's right to remove liquid or liquefiable hydrocarbons or hydrogen sulphide from the gas produced from said reserves and there shall be no obligation, express or implied, on Shamrock's part to make payments to Columbian [plaintiff] on the proportionate part of said residue gas above specified, except as, if and when such residue gas is sold or used by Shamrock for purposes other than specified in subparagraphs (a), (b), (c) and (d) of Section 3 above; provided that if Shamrock should cease to process through its plant or plants the gas produced from its sour

gas reserves, or any part thereof, and shall make sale thereof at the well or wells where produced, then such payments shall be applicable to the proportionate part of the raw gas volumes that may be sold by Shamrock."

10. In Anderson v. Helvering, 310 U.S. 404, 409, 60 S.Ct. 952, 84 L.Ed. 1277 (1940), the Court said:
"A share in the net profits derived from development and operation * * * does not entitle the holder of such interest to a depletion allowance even though continued production is essential to the realization of such profits."

The Supreme Court seems to have had a more conventional and substantial type of "investment" in mind. See Parsons v. Smith, supra; Commissioner v. Southwest Exploration Co., supra.

For these reasons, I would grant judgment for the defendant.